Matthias, J.
 

 The claims
 
 for
 
 unemployment compensation involved herein cover the period of the suspension of the operation of coal mines resulting from a controversy between workmen and operator." At the threshholcl of a consideration of this case, let it be clearly understood that there is no issue as to the right of workmen to bargain collectively through their authorized representatives and no question of their right to refuse to continue their employment whenever for
 
 *602
 
 any reason they choose so to do. It is the well settled and unquestioned right of workmen, unless in violation of an existing contract, singly, or through united and concerted action, to discontinue work and by such means endeavor to secure higher wages, better hours and improved working conditions. The reasonableness or unreasonableness of the demands made is not a matter for the consideration of the court, and we in this case have nothing whatever to do with the merits of the controversy between employer and employees. The only function of the court is to construe the provisions of the Unemployment Compensation Act of this state and determine whether as applied to the facts the claimants are entitled to the compensation they claim.
 

 The claims for unemployment compensation arose out of a situation which is disclosed by a rather voluminous record, but the facts so far as' essential to the consideration and decision of the case may be briefly stated.
 

 The United Mine Workers of America, as the bargaining agency for the miners had entered into a contract with the various coal companies, including the appellant, as to wages, hours and working conditions, known as the Appalachian Agreement, which, under its terms, expired March 31,1941. The Appalachian Joint Conference included the Ohio Coal Association and District No. 6, United Mine Workers of America. The conference had been founded in 1933, its objective being the consummation of contract between employer-members of the joint conference and the employee-members thereof. Prior to the expiration of the 1939 contract, and pursuant to and in accordance with its terms and provisions, there were negotiations between the parties preparatory to and in anticipation of entering into a new contract. Under joint-conference rules, unanimous agreement by all the representatives to the
 
 *603
 
 joint conference was required before either temporary or permanent contracts could be adopted and all negotiations were carried on under this so-called ‘ ‘ unit rule. ’ ’
 

 In accordance with the established custom and procedure of the joint conference, various proposals were submitted by the parties, the United Mine Workers of America proposing wage-rate increases, hospitalization, guaranteed working days per year and vacations with pay (not theretofore included,in the contracts between the parties); and the operators proposing that the contract .expiring March 31, 1941, be extended for two years “with the instructions that only by mutual consent shall anything be done in district conferences that will increase the cost of production or decrease the earning capacity of the men.”
 

 John L. Lewis, president of the United Mine Workers of America, proposed to have the employees continue work during the negotiations, provided that any increase in wages or improvement in conditions, which might be agreed upon, should apply retroactively from the date of April 1, 1941. The operators proposed that, pending negotiations, work be continued at the same wages and under the same conditions as provided in the then existing contract. By reason of the “unit rule,” both proposals failed of adoption and no agreement for continuance of work was effected. The only agreement adopted by the conference provided for the continuance of work on the part of so-called maintenance employees who kept the mines in condition for operation. Work by all production employees simultaneously ceased March 31, 1941.
 

 April 1 is recognized as a miners’ holiday. The evidence before the board of review warranted its finding that the mines, which had been in operation up to March 31, did not resume operation on April 2 for the reason that no production men reported for
 
 work;
 
 that at the several mines involved, work notices had
 
 *604
 
 been posted for several days prior thereto that work was then and would continue to be available; that the mines were ready at all times for operation and orders for coal were on hand; and that mine operations could have been continued on that date and throughout the month of April.
 

 The record shows that throughout the entire period of the conference the operators urged that, pending negotiations, in the.event no agreement was reached by March 31, work continue on the same basis and conditions as were incorporated in the 1939 Appalachian Agreement; and that the representatives of the miners, as late as March 28,1941, specifically rejected such proposal.
 

 The statutory provisions governing and controlling the issues presented were those which were contained in Section 1345-6, General Code (118 Ohio Laws, 266), as in force and effect prior to the amendment thereof effective October 1, 1941. The statutory provisions essential to a decision of this case were as follows:
 

 “b.'No individual shall be entitled to any benefits unless he or she
 

 “(1) Is capable of and available for work;
 

 “(2) Is unable to obtain work in his usual trade or occupation or any other employment for which he is reasonably fitted including employments not subject to this act, or is suffering loss of remuneration by reason of involuntary partial unemployment. * * *
 

 “a.
 
 No benefits shall be payable to any individual who has lost his employment .or has left his employment by reason of strike in the establishment in which he was employed, as long as such strike continues; *
 
 * *
 
 or who refuses to accept an offer of work for which he is reasonably fitted.
 

 “d. * * * those who have voluntarily quit their work
 
 *605
 
 without just cause, and thereafter are unable to secure other work, shall have a waiting period of six weeks during which no benefits shall be payable.”
 

 From a consideration of these provisions is to be determined the question whether under the facts presented the claimants herein are entitled to the payment of unemployment compensation.
 

 Before entering upon a discussion of these provisions, a reminder of the purpose and object underlying the enactment of the Unemployment Compensation Act seems appropriate. From its origin its primary objective was the salutary and laudable purpose of making lighter the burdens which had theretofore fallen upon workmen and their families as a result of adverse business and industrial conditions causing involuntary unemployment and creating the necessity for temporary economic relief. The Unemployment Compensation Act was not designed to provide benefits for those wilfully idle or voluntarily and purposely unemployed:
 

 It was pursuant to the high purpose and praiseworthy design above stated that provision was made for the accumulation of a fund by means of contributions exacted from employers for the benefit of those who suffer the loss of employment, not through any fault or choice of their own, but because they become the unfortunate and unwilling victims of adverse business and industrial conditions.
 

 The question of first importance, and in our view' its decision is determinative of the ease, is whether the industrial conditions which prevailed at the mines where claimants were employed were such as to constitute a strike, for, under the clear and explicit provisions óf the statute, “no benefits shall be payable to any individual who has lost his employment or has left
 
 *606
 
 his ■ employment by reason of strike in the establishment in which he was employed, as long as such strike continues.”
 

 The term “strike” as defined by the Century Dictionary is “a concerted or general quitting of work by a body of employees in order to coerce their employer or employers in some way, as when higher wages or shorter hours are demanded, or a reduction of wages is resisted; any general refusal to work * * * as a coercive measure.” • •
 

 The definition of “strike,” upon which authorities are in substantial accord, is that it is a cessation of work by employees in an effort to obtain more desirable terms. We are unable to find anywhere a more concise definition of the term than that in 4 Restatement of Torts, 140, Section 797, which is as follows: “A concerted refusal by employees to do any work for their employer, or to work at their customary rate of speed, until the object of the strike is attained, that is, until the employer grants the concession demanded. ’ ’
 

 It is well settled that in the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used.
 

 The Appalachian Joint Conference was created for the evident purpose of carrying on collective bargaining on an industrial basis. The nature, purpose and effect of such procedure are stated in the opinion of the Supreme Court of the United States in the case of J. I.
 
 Case Co.
 
 v.
 
 National Labor Relations Board,
 
 321 U. S., 332, 88 L. Ed., 762, 64 S. Ct., 576, as follows:
 

 “Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and
 
 *607
 
 work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it -and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment. * * *
 

 “After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hirings. The employer, except as restricted by the collective agreement itself and except that he must engage in no unfair labor practice or discrimination, is free to select those he will employ or discharge. But the terms of the employment already have been traded out. There is little left to individual agreement except the act of hiring. This hiring may be by writing or by word of mouth or may be implied from conduct. In the sense of contracts of hiring, individual contracts between the employer and employee are not forbidden, but indeed are necessitated by the collective bargaining procedure.”
 

 The unemployment compensation acts of several other states, including the Ohio act now in effect, preclude unemployment compensation if the unemployment results from a “labor dispute,” and there are many decisions involving the construction and application of the term “labor dispute.”
 

 Although under our act, as it existed at the time of the unemployment period with which we are concerned, the term “strike” and not “labor dispute,” was employed to designate the situation which would preclude the allowance of unemployment compensation if the claimant’s loss of employment resulted from the situation designated, the court decisions, whether construing and applying the term “strike” or the term “labor dispute” as a cause of unemployment, are found to be helpful and in some instances quite persuasive in the
 
 *608
 
 construction and application of the provisions of our statute. It is stated by the Supreme Court of Colorado in the case of
 
 Sandoval
 
 v.
 
 Industrial Commission,
 
 110 Colo., 108, 130 P. (2d), 930, that:
 

 “Conceivably, a labor dispute may exist without a strike. A labor dispute that is accompanied by a concerted refusal to work for the employer until the dispute is resolved in favor of the men’s contentions, furnishes’all the elements of a strike.”
 

 The cases to which we shall refer involve either “strikes” or “labor disputes” and are as follows:
 

 Farmers Loan & Trust Co.
 
 v.
 
 Northern Pac. Rd. Co.,
 
 60 F., 803, 819;
 
 Barnes
 
 v.
 
 Hall,
 
 285 Ky., 160, 146 S. W. (2d), 929 (certiorari denied by United States Supreme Court,
 
 Hall
 
 v.
 
 Barnes et al., Unemployment Compensation Comm.,
 
 314 U. S., 628, 86 L. Ed., 505, 62 S. Ct., 59);
 
 Block Coal & Coke Co.
 
 v.
 
 United Mine Workers of America,
 
 177 Tenn., 247, 148 S. W. (2d), 364;
 
 Department of Industrial Relations
 
 v.
 
 Pesnell,
 
 29 Ala. App., 528, 199 So., 720 (certiorari denied by Alabama Supreme Court, 240 Ala., 457, 199 So., 726);
 
 Walter Bledsoe Coal Co.
 
 v.
 
 Review Board of Employment Security Div.,
 
 221 Ind., 16, 46 N. E. (2d), 477;
 
 Deshler Broom Factory
 
 v.
 
 Kinney, Commr.,
 
 140 Neb., 889, 2 N. W. (2d), 332;
 
 Sandoval
 
 v.
 
 Industrial Commission,
 
 110 Colo., 108, 130 P. (2d), 930;
 
 Jennings
 
 v.
 
 Lee,
 
 295 F., 561;
 
 Miners in General Group
 
 v.
 
 Hix,
 
 123 W. Va., 637, 17 S. E. (2d), 810;
 
 Board of Review
 
 v.
 
 Mid-Continent Petroleum Corp.,
 
 193 Okla., 36, 141 P. (2d), 69;
 
 Chrysler Corp.
 
 v.
 
 Smith,
 
 297 Mich., 438, 298 N. W., 87, 135 A. L. R., 900;
 
 Nobes
 
 v.
 
 Michigan Unemployment Compensation Commission,
 
 313 Mich., 472, 21 N. W. (2d), 820.
 

 In the
 
 Bledsoe case, supra,
 
 it was held that where there exist a wage disagreement between the employer and employees as a whole, a demand by em
 
 *609
 
 ployees for new and different terms, a refusal of the employer to comply, and a refusal of the employees to work as a consequence, a situation so created constitutes a strike in the ordinary meaning of the word.
 

 It may be noted, as a matter of interest, that the case just referred to involved claims for benefits for the period of the 1941 suspension in the coal industry, being the same situation as that under consideration in this case. That case clearly and definitely holds that the suspension in the coal industry during the period involved in this case was a strike and by reason thereof the employees affected thereby were not entitled to benefits under the provision of the Unemployment Compensation Act. It was' well said by the court in that case:
 

 “It is perfectly legal for employees to contend for better wages and working conditions and to refuse work if their demands are not complied with, and it cannot legally be said that such action is worthy of censure or that it constitutes wrongdoing.
 

 “It must be concluded that the purpose of the act was to provide benefits to those who were'involuntarily out of employment, and not to finance those who were willingly and deliberately refusing to work because of a refusal of their employers to accede to demands for higher wages.”
 

 It was said by the court in the
 
 Farmers Loan & Trust Co. case, supra:
 
 “* * * there are running through all of them [definitions of “strike”] two controlling ideas: First, by compulsion to extort from the employer the concession demanded; second, a cessation of labor, but not the abandonment of employment. The stoppage of work is designed to be temporary, continuing only until the accomplishment of the design, and upon its accomplishment the resumption of employment. The cessation of labor is not a
 
 bona fide
 
 
 *610
 
 dissolution of contractual relations and an abandonment of the employment, but is designed as a means of coercion to accomplish the desired result.”
 

 The National Labor Relations Act defines “labor dispute” as follows:
 

 “The term ‘labor dispute’ includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing,.or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.” (Title 29, Section 152 [9], U. S. Code.)
 

 However, the mere statement of the facts clearly shows that the situation presented in the instant case was not only a “labor dispute” which, under the terms of the statutes of various states, as construed and applied by the courts of those states, precluded the allowance of claims for unemployment compensation, but that such “labor dispute” had gone further and that work was actually terminated, or at least suspended, by the concerted action of the employees in discontinuing work as a body for the purpose of enforcing the terms of employment desired by them. We, therefore, deem the following statement of the court in the
 
 Pesnell case, supra,
 
 peculiarly apt and pertinent here:
 

 ‘ ‘ The Legislature, in our opinion, never intended for a member of a union to draw unemployment benefits, while his bargaining agents are discussing the terms of a proposed contract, where the union itself has ordered work to cease until its terms are met. That is not our conception of unemployment. Voluntary idleness during discussion, by appellee’s agents, of a proposed contract, can hardly be termed unemployment. * * * It was the union, not the employer, who refused to mine coal without a new contract. The union could
 
 *611
 
 take that position under the law, but its right to take that position did not prevent the controversy from being a labor dispute. Tire appellee’s situation was created by his duly selected bargaining agents. Their acts were his acts. It would be difficult for us to reach the' conclusion that the appellee [claimant] could, under the law, bring about a cessation of work and then claim he was unemployed within the terms of the Unemployment Insurance Act.”
 

 In the case of
 
 Board of Review
 
 v.
 
 Mid-Continent Petroleum Corp., supra,
 
 the Supreme Court of Oklahoma had under consideration a claim for unemployment compensation, which was contested on the ground that the claimant’s unemployment was due wholly to stoppage of work occasioned by a “labor dispute” at the company’s plant where he was employed.
 

 In construing and applying the provisions of the statute of that state, which disqualified an individual for benefits under the act if his unemployment “is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises in which he is or was last employed,” the court construed the term “stoppage of work” as synonymous with “strike.” The contention made by counsel for the claimant in that case was that unless the plant in which the claimant was employed actually stops operation by reason of the labor dispute, the striker who remains out may receive compensation for unemployment. The court rejected their contention. In doing so the court announced the conclusion that “an individual who ceases work by reason of a labor dispute or strike against his employer is ineligible for benefits under the Oklahoma unemployment compensation law of 1936, so long as he participates in such dispute and remains out of employment by reason thereof.” That court took the position that if it were to adopt the view contended for by counsel for claimant it would
 
 *612
 
 be tantamount to holding that the Legislature intended the unemployment fund to be used to support strikes, and there was nothing in the act to indicate such intention. The purpose of the act, as stated, was “for the compulsory setting aside of unemployment compensation funds to be used for the benefit of persons unemployed through no fault of their own.”
 

 In the case of
 
 Deshler Broom Factory
 
 v.
 
 Kinney, supra,
 
 the Supreme Court of Nebraska held:
 

 “The Unemployment Compensation Act does not purport to grant benefits to workmen who leave their work voluntarily; neither does it intend for an employee to benefit from the act while his bargaining agents are attempting to adjust their differences with the employer. That is not the ordinary conception of unemployment. Voluntary idleness under such conditions is not unemployment. It would be extremely difficult for us to reach the conclusion that claimants could voluntarily bring about a cessation of work and then claim they were unemployed within the provisions of the act. * * * Claimants were voluntarily out of work because they elected to use this method of coercing payment.”
 

 That court approved and applied the statement by a district court of appeals of California in the case of
 
 Bodinson Mfg. Co.
 
 v.
 
 California Employment Commission
 
 (Cal. App.), 101 P. (2d), 165, 170, which is as follows:
 

 “This trust [unemployment compensation] fund was not created to be used as a weapon to coerce employers to submit to the demands of striking employees by paying the maintenance of workmen while they engage in prosecuting a strike. Nor was it intended to be' used, as an instrument to aid strike-breaking. On the contrary, it was enacted for the avowed purpose of assisting workmen while they are out of employment through no fault of their own.”
 

 
 *613
 
 In the case of
 
 Nobes
 
 v.
 
 Michigan Unemployment Compensation Commission, supra
 
 (decided March 4, 1946), the Supreme Court of Michigan held that, where a strike became effective and a picket line was established causing complete cessation of work as a result of the refusal of an employer company to accede to the demands of a local union for its recognition as the sole bargaining agent for the employees of such company and that the company adopt a designated system for presentation of grievances and also adopt and publish seniority lists, employees were not entitled to unemployment compensation during such stoppage of work. It was the conclusion of the court, based upon the provisions of the Michigan Unemployment Compensation Act, that all such employees, whether members of the. union or not, were out of employment by reason of a labor dispute and were precluded from unemployment compensation because “directly interested” in the matter of the dispute.
 

 Although the courts which previously considered the instant case entertained the view that after the expiration of the 1939 contract there was no longer any employer-employee relationship and treated that as a controlling factor in their decisions, counsel for claimants indicates a different view when he states that, although after March 31,1941, “their contract of employment was incomplete because of the expiration of that portion of the contract covering wages, hours and working conditions, the appellees continued to be employees of the appellant. However, there was no obligation or duty on them to work until such a time as their contract of employment had been completed, to-wit: An agreement covering rates of pay, hours of work and conditions of employment.”
 

 This is a reiteration of the contention that the unemployment of claimants was merely the result of the expiration of the contract and refers to the constant
 
 *614
 
 insistence-that if there is no contract there will be no work. When this is followed by the further declaration that there will be no contract unless the terms demanded are acceded to and such demand is accompanied by a continuous refusal to work, that situation is, under all the authorities, a “strike.” In the
 
 Block Coal & Coke Co. case, supra,
 
 having reference to the claim made in that case that the unemployment was due to the expiration of the two-year contract by which the parties had been governed, which expiration was at midnight of March 31, and that the cessation of work was due to the lack of a new contract, the Supreme Court of Tennessee, in its opinion, stated: “Conceding this argument to be ingenious, we are unable to conceive its soundness. The lack of a new contract was certainly due to this dispute.”
 

 The question of the relationship of employer and employee during the period of a strike was involved in the case of
 
 Sandoval
 
 v.
 
 Industrial Commission, supra.
 
 The facts in that case being so pertinent and the discussion by the court being so applicable to the issues presented by the instant case, and so clearly presenting our own View we quote extensively from it, as follows:
 

 “ * # # employment at the old contract rate and under the old conditions was available. The employers were under no contract duty to offer more; on the other hand, the miners were under no contract obligations to work for the same wages and under the same conditions; but it was the employees who were seeking a change in the
 
 status quo
 
 and not the employers. The miners refused to work unless the
 
 status quo
 
 was modified. * * • '
 

 “A concerted refusal to work, or a concerted cessation of work in and of itself under such circumstances as are presented in this case, is but the exercise of a right and violates no contractual obligation the men owe to the operators. A refusal to employ un
 
 *615
 
 der such circumstances violates no contractual obligation the operators owe to the men. It is not necessary, however, that there be such contractual obligations in order that a strike exist. While the men were unemployed, expecting to return to work, and while the operators had closed their mines expecting, however to reopen them and re-employ the men, an
 
 actual
 
 employer-employee relationship did not exist; but neither was their relationship the same as that of men seeking employment from and negotiating for terms with operators between which and them an actual employer-employee relationship had never existed. As near as the relationship that did exist can be described, it was a suspended employer-employee relationship and recognized by both parties as such.
 

 “* * * Such a suspended employer-employee relationship is an essential ingredient of a strike* for if an actual employee-employer relationship never existed, or if the refusal to work by the men is with the intention never to be re-employed by the employer, it is not a strike. * * *
 

 “The men’s bargaining agency, which the operators recognized and accepted, had not succeeded in effecting a new, so-called Appalachian Agreement, which all these records disclose would have ended the difficulties that arose in Colorado due to the termination of the Colorado contracts prior to its consummation.
 
 * * *
 

 ‘ ‘ The terms of the expired contract, the negotiations of March 22, and all prior dealings .between the men and the operators, indicate an intended continuance after the expiration of the contract of the employer-employee relationship. The operators still wanted to employ the men and the men still wanted to work. During the interim the operators were willing to maintain the
 
 status quo.
 
 and the men wanted to change y. # # * 5?
 

 The conclusion of the court in that case was “that
 
 *616
 
 the evidence in the record supports the finding of the commission that the interim refusal of the men to work unless guaranteed the contingent benefit of future action which was then unascertained and unascertainable, constituted a demand for a modification of working-conditions and rates of pay and that their refusal to work until there was a compliance with such demand, did constitute a strike.”
 

 It is the further contention of counsel for the claimants in the instant case that “nowhere in this record are there any facts which would lead one to the conclusion that the claimants were on strike; there was no positive action on their part.”
 

 »We do not find anywhere any authority supporting the view that any
 
 “positive action,”'
 
 such as a proclamation preceding a concerted cessation of work in a plant or industry, announcing an intent and purpose to go out on a strike, must be established by proof before such concerted action by employees may be deemed a strike.
 

 ‘ No juggling of words or technical construction of the language of proposals or counterproposals of the parties to this controversy can serve to camouflage the facts which disclose a complete suspension of the production of an industry by the united and organized action of those employed therein, motivated by the announced purpose of enforcing compliance with terms and conditions' demanded. Such action constitutes a strike, and the manner of the termination thereof or the results actually accomplished thereby are of course immaterial.
 

 It is to be observed that the period of idleness of the claimants herein followed the expiration date of the so-called Appalachian Agreement of 1939, which was March 31, 1941, and their idleness continued pending
 
 *617
 
 negotiations for a new agreement. The claimants and the appellant had reached an agreement on April 21, 1941, to resume work, but the southern operators having previously withdrawn from the joint negotiating committee, to which all matters had been delegated, the representatives of the miners, being “unwilling to divide their forces,” further deferred the resumption of mining operations until the southern operators and miners agreed, which was on April 29, 1941. The benefits now claimed in this case are for the period from April 2 to April 29, 1941.
 

 Let us repeat that the claimants, just as any other employees, had a right to insist upon better terms and improved working conditions and also the right singly or collectively to refuse to continue work under their expiring contract for the purpose of enforcing the terms demanded by them. They were free to make their choice, but, having elected to strike, they lost their employment or left their employment by reason of such strike, and, under the clear and explicit terms of the statute, precluded themselves from receiving unemployment compensation during such period.
 

 It should be borne in mind that the claimants at all times had the opportunity to continue or resume employment at the very same work previously performed by them and under the same terms and conditions which had prevailed for two- years. For the reasons set forth we do not reach a consideration of the issue of the acceptance or rejection of new work and have considered no question of eligibility of the claimants to unemployment compensation arising under the provisions of Section 1345-6, General Code, other than those hereinbefore recited.
 

 It follows that the judgment of the Court of Appeals affirming the judgment of the Court of Common Pleas
 
 *618
 
 which reversed the decision of the board of review, should be, and hereby is, reversed, and the decision of the board of review is affirmed.
 

 Judgment reversed.
 

 Weygandt, C. J., Zimmerman, Bell, Williams, Turner and Hart, JJ., concur.