**ABATE et al., Appellees,**

v.

**WHEELING–PITTSBURGH STEEL CORP. et al., Appellants.**

[Cite as *Abate v. Wheeling–Pittsburgh Steel Corp.* (1998), 126 Ohio App.3d 742.]

Court of Appeals of Ohio,
Seventh District, Belmont County.

No. 97–BA–13.

Decided March 23, 1998.

*Timothy F. Cogan* and *Patrick S. Cassidy,* for appellees.

*Felix C. Wade* and *David A. Kadela,* for appellant Wheeling–Pittsburgh Steel Corp.

*Betty D. Montgomery,* Attorney General, and *Frank J. Reed,* Assistant Attorney General, for appellant Ohio Bureau of Employment Services.

*James L. Messenger* and *Richard N. Selby,* urging reversal for Manufacturing Association of Eastern Ohio and Western Pennsylvania.

---

Cox, Judge.

This matter presents a timely appeal from a judgment rendered by the Belmont County Common Pleas Court modifying and reversing the decision of the Unemployment Compensation Board of Review denying claimants-appellees unemployment compensation during a labor dispute. There are over one thousand appellees, all of whom are employees of defendant-appellant Wheeling–Pittsburgh Steel Corporation ("WPSC"), a steel production plant located in Jefferson County, Ohio. As they are too numerous to name individually, claimants-appellees will be referred to collectively as "appellees" throughout this opinion.

Under a collective bargaining agreement, WPSC guaranteed appellees defined pension benefits upon retirement. In 1985, WPSC went bankrupt and terminated the defined-benefit pension plan ("DBP Plan") under an agreement with the Pension Benefit Guaranty Corporation ("PBGC"). The agreement replaced the DBP Plan with a defined-contribution plan and prohibited renewal of the DBP Plan until WPSC had been out of bankruptcy for five years. WPSC emerged from bankruptcy in 1991.

The United Steelworkers of America represented hourly employees at WPSC's Ohio Valley Plants in a series of collective bargaining agreements. WPSC and the union began negotiating the most recent of those agreements in 1994. Discussions centered on the importance of a DBP Plan. Union negotiators requested that a DBP Plan come into effect in 1996, when PBGC's five-year restriction on renewal lifted. Following a two-day strike, the parties reached a settlement and agreed to commence negotiations over a new pension arrangement in January 1996, the purpose of which was to implement a renewed DBP Plan. Effective March 1, 1994 to October 1, 1996, the 1994 agreement between the union and WPSC deliberately deviated from the customary four-year term to coincide with the lifting of PBGC's renewal restriction. The following contract provision, Article XIX, Section 19.4, entitled "Termination Date," represented the aforementioned negotiations:

"On or after November 15, 1995, either party may given 60 days' written notice of its desire to commence negotiations with respect to retirement benefits. Such negotiations may commence on January 15, 1996 or such later date upon which the parties mutually agree."

As intended, negotiations over retirement benefits began in January 1996, with a preliminary meeting to discuss pensions and the problems surrounding the issue. Contemporaneously, the union requested information from WPSC regarding appellees' accrued retirement benefits. In a letter dated June 11, 1996, Ronald LaBow of WPSC's parent company, WHX Corporation ("WHX"), wrote George Becker, the union's president, requesting a two-month extension of the 1994 agreement and rejecting a DBP Plan unless WHX acquired Teledyne Corporation. The letter explained:

"The reason for the requested extension relates to both the USWA demands for defined benefit pension plan * * * and to the uncertain status surrounding the Teledyne transaction. As discussed more fully at our meeting it is our strongly held belief that Wheeling–Pittsburgh cannot agree to a defined pension benefit plan and remain a competitive entity going forward, unless we complete the Teledyne or some similar type of transaction."

WHX never acquired Teledyne.

The union refused WHX's request and submitted written notice to WHX that indicated that the 1994 agreement would expire on October 1, 1996, as originally contemplated. Nevertheless, the union continued to stress the importance of a renewed DBP Plan and formally proposed a DBP Plan on September 5, 1996, at the first of seven main-table discussions.

The next main-table discussion occurred on September 17, 1996. Here, WPSC made its first pension proposal, offering to maintain the existing defined-contribution plan with significant increases and additional annuities. Several appellees testified that this proposal was not a permanent pension plan, in that it was good only under the Separation Incentive Plan of the 1994 agreement, a buyout plan.

Subsequent main-table discussions included talks on modified pension proposals, wage proposals, and orderly shutdown. WPSC's various pension proposals included increases in a defined-contribution plan, however, none considered a DBP Plan. Thus, not only did WPSC reject a DBP Plan *ab initio,* but it offered to extend only part of the 1994 agreement. WPSC's proposals considered extending the 1994 agreement only with respect to wages, not pensions.

The 1994 agreement expired on October 1, 1996. At 12:01 that morning, appellees walked off their jobs, refusing to work under existing conditions and insisting upon a DBP Plan.

Appellees filed for unemployment benefits. The matter was referred to a staff hearing officer of the Ohio Bureau of Employment Services ("OBES"). A hearing was conducted on November 4, 1996. On November 22, 1996, the hearing officer determined that appellees were not entitled to receive unemployment compensation because they were unemployed due to a labor dispute other than a lockout.

The Unemployment Compensation Board of Review disallowed an application for further appeal, and appellees then appealed to the Common Pleas Court. The lower court modified and reversed the board's decision as being contrary to law and allowed appellees' claim for unemployment compensation. This appeal followed.

At the outset, our standard of review on appeal must be discussed. R.C. 4141.28(O)(1) sets forth the standard of review to be applied in unemployment compensation cases and states as follows:

"If the court finds that the decision was unlawful, unreasonable, or against the manifest weight of the evidence, it shall reverse and vacate such decision or it may modify such decision and enter final judgment in accordance with such modification; otherwise such court shall affirm such decision."

The Ohio Unemployment Compensation Act, R.C. 4141.01 *et seq.*, "does not create distinctions between the scope of review of common pleas courts and appellate courts." *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Serv.* (1995), 73 Ohio St.3d 694, 696–697, 653 N.E.2d 1207, 1210. In reviewing the board's decision, an appellate court must apply the same standard of review as the lower court. Thus, an appellate court may reverse the board's decision only if it is "unlawful, unreasonable, or against the manifest weight of the evidence." *Id.* at 697, 653 N.E.2d at 1210. The court shall not make factual findings or assess a witness's credibility. *Id.* at 696, 653 N.E.2d at 1210, quoting *Irvine v. Unemployment Comp. Bd. of Review* (1985), 19 Ohio St.3d 15, 19 OBR 12, 482 N.E.2d 587. The court may determine only whether the evidence supports the board's decision and, thus, shall not conduct a de novo review. *Id.* at 696–697, 653 N.E.2d at 1210–1211.

Additionally, an appellate court must review the lower court's decision to determine if it abused its discretion in ascertaining whether the board's decision was "unlawful, unreasonable, or against the manifest weight of the evidence." *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 614 N.E.2d 748. "Abuse of discretion connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Tracy v. Merrell Dow Pharmaceuticals, Inc.* (1991), 58 Ohio St.3d 147, 152, 569 N.E.2d 875, 880.

The sole assignment of error alleged by appellant OBES and the first assignment of error alleged by employer-appellant WPSC are similar in nature and therefore will be discussed together. They are as follows:

"The Common Pleas Court erred in reversing the Board of Review's decision that held the employees of Wheeling–Pittsburgh Steel Corporation were unemployed due to a labor dispute other than a lockout, when such decision was not unlawful, unreasonable or against the manifest weight of the evidence."

"The Common Pleas Court erred in finding that employees engaged in a work stoppage are presumed to be entitled to unemployment benefits and that their employer bears the burden of rebutting the presumption by proving that the work stoppage was brought about by a strike and not a lockout."

Appellants contend that the lower court incorrectly relied upon R.C. 4141.25 to support its position that appellees were presumed entitled to unemployment compensation. Appellants indicate that R.C. 4141.25 addresses employer contribution rates to unemployment trust funds, not benefit entitlement, and, thus, the lower court erred in relying on this provision. Furthermore, appellants argue that the lower court made a fundamental mistake by requiring WPSC to bear the burden of establishing that the unemployment was due to a labor dispute other than a lockout.

■ The objective of the Ohio Unemployment Compensation Act is to ameliorate the burdens on employees suffering from involuntary unemployment and to provide them with short-term financial relief. *Baker v. Powhatan Mining Co.* (1946), 146 Ohio St. 600, 33 O.O. 84, 67 N.E.2d 714. *Baker* stressed at 605, 33 O.O. at 87, 67 N.E.2d at 717:

"It was pursuant to the high purpose and praiseworthy design above stated that provision was made for the accumulation of a fund by means of contributions exacted from employers for the benefit of those who suffer the loss of employment, not through any fault or choice of their own, but because they become the unfortunate and unwilling victims of adverse business and industrial conditions."

The prescribed contribution rates to the fund described in *Baker* are embodied in R.C. 4141.25 and defined in R.C. 4141.01(L)(1) as "money payments to the state unemployment compensation fund required of employers by section 4141.25 of the Revised Code."

Additionally, R.C. 4141.46 mandates that the Act be liberally construed to favor the persons benefited. The court in *Adamski v. Ohio Bur. of Unemp. Comp.* (1959), 108 Ohio App. 198, 204, 9 O.O.2d 220, 223, 161 N.E.2d 907, 913, elaborated:

"By 'liberal construction' is not meant that words shall be given an unnatural meaning, or that the meaning shall be enlarged or expanded to meet a particular

state of facts. A liberal construction must still be a fair and reasonable one, in an effort always to ascertain the legislative intent."

■ Notwithstanding R.C. 4141.46, both parties carry a burden of proof as to whether employees are entitled to unemployment compensation under R.C. 4141.29(D)(1)(a). Initially, a claimant is burdened with establishing a right to unemployment compensation. *Irvine, supra.* To prove otherwise, the employer must show that employees were unemployed due to a labor dispute other than a lockout. *Bays v. Shenango Co.* (1990), 53 Ohio St.3d 132, 134–135, 559 N.E.2d 740, 742–744.

■ The lower court correctly relied on R.C. 4141.25 to support its position that employees are presumed entitled to unemployment compensation. The contribution requirement in R.C. 4141.25 furthers the Ohio Unemployment Compensation Act's objective by providing financial assistance to employees unemployed through "no fault of their own." Common sense dictates that the legislature would not create an unemployment compensation fund to benefit those involuntarily unemployed and then presume that those individuals were *not* entitled to benefits. Taken together, R.C. 4141.25, the legislative intent of the Act, and the liberal-construction mandate of R.C. 4141.46 support the lower court's finding that employees are presumed entitled to benefits.

WPSC's first assignment of error and appellant OBES's sole assignment of error are found to be without merit.

WPSC's second assignment of error alleges:

"The Common Pleas Court misinterpreted the status quo test by finding that the Company had the burden of proving that it offered to extend the expired collective bargaining agreements."

R.C. 4141.29(D)(1)(a) provides:

"Notwithstanding division (A) of this section, no individual may serve a waiting period or be paid benefits under the following conditions:

"(1) For any week with respect to which the administrator finds that:

"(a) His unemployment was due to a labor dispute other than a lockout at any factory, establishment, or other premises located in this or any other state and owned or operated by the employer by which he is or was last employed; and for so long as his unemployment is due to such labor dispute."

■ The entitlement of these employees to unemployment compensation benefits hinges on whether their unemployment was due to a labor dispute other than a lockout. These employees are entitled to unemployment compensation only if the work stoppage was a lockout. Generally, a labor dispute is " 'a

controversy between employer and employees concerning wages, working conditions or terms of employment.' " *Bays, supra,* 53 Ohio St.3d at 134, 559 N.E.2d at 742, quoting *Leach v. Republic Steel Corp.* (1964), 176 Ohio St. 221, 223–224, 27 O.O.2d 122, 123, 199 N.E.2d 3, 5. A strike is " 'a cessation of work by employees in an effort to obtain more desirable terms with respect to wages, working conditions, etc.' " *Id.*

In *Zanesville Rapid Transit, Inc. v. Bailey* (1958), 168 Ohio St. 351, 354, 7 O.O.2d 119, 121, 155 N.E.2d 202, 205, the Ohio Supreme Court defined a "lockout" as "a cessation of the furnishing of work to employees or a withholding of work from them in an effort to get for the employer more desirable terms." Furthermore, it expressed that if modifications in working conditions are reasonable, employees would be expected to continue work. *Id.* at 354–355, 7 O.O.2d at 121–122, 155 N.E.2d at 205–206. Failure to work under reasonably acceptable conditions would not constitute a lockout. *Id.* However, the converse is also true. Where an employer offers its employees unreasonable conditions of continued employment, an employee's failure to accept these conditions would not constitute a strike. *Bailey, supra.* The court summarized:

"The real test whether the imposition by the employer of changed conditions of employment is a withholding of work so as to constitute a lockout lies in the question whether the conditions imposed are such that his employees could not be expected to continue work under them and, in reason, they had no other course open to them but to leave their employment." *Id.* at 355, 7 O.O.2d at 122, 155 N.E.2d at 205.

In *Bays, supra,* the Ohio Supreme Court delineated the *status quo* test to be employed in determining whether a labor dispute is a strike or a lockout. Quoting the test developed in *Erie Forge & Steel Corp. v. Unemployment Comp. Bd. of Review* (1960), 400 Pa. 440, 443–445, 163 A.2d 91, 93–94, the Ohio Supreme Court stated at 53 Ohio St.3d at 134–135, 559 N.E.2d at 743:

" '[T]he sole test under * * * the Unemployment Compensation Law, * * * of whether the work stoppage is the responsibility of the employer or the employees is reduced to the following: Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification of unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply.' "

Additionally, the Ohio Supreme Court noted that negotiations should be conducted in good faith, aimed toward preserving the agreement. *Id.* at 135, 559 N.E.2d at 743. The Ohio Supreme Court stressed that under the *status quo* test, both parties' actions must be scrutinized to determine which party first deviated from the *status quo*. The Ohio Supreme Court defined the *status quo* as the " 'terms of a pre-existing collective bargaining agreement pending final settlement of a labor dispute.' " *Id.*, quoting *Oriti v. Ohio Bur. of Emp. Services* (1983), 7 Ohio App.3d 311, 7 OBR 394, 455 N.E.2d 720.

■ WPSC contends that the lower court misconstrued the *status quo* test in *Bays* when it considered as the threshold question whether WPSC offered to extend the existing contract. WPSC asserts that if the lower court had applied the *status quo* test correctly, the dispositive issue would have been whether appellees offered to extend the existing contract. WPSC argues that had that question been asked, the test would have failed because appellees made only a conditional offer, one which deviated from the *status quo*.

WPSC errs in asserting that the lower court misread the *status quo* test by considering as the threshold question whether WPSC offered to extend the existing contract. The lower court did not deem this the threshold question. In analyzing the record, particularly the hearing officer's examination of Larry Mallas, chemical technician for WPSC and president of the local union, the lower court simply stated that the questions asked "wittingly or unwittingly compelled witnesses to answer questions requiring legal conclusions without laying a foundation for those conclusions." Questions of this type would not aid the board of review in determining whether the employer sought to maintain the *status quo*, merely one part of the *status quo* test.

A critical step in applying the *status quo* test is determining the *status quo* to be maintained. That is, what were the terms of the then existing collective bargaining agreement? During the 1994 agreement negotiations, union negotiators stressed the importance of implementing a DBP Plan in 1996 when PBGC's five-year restriction on renewal would be lifted, and the union requested that a DBP Plan come into effect at that time. The 1994 agreement included a termination provision, stating that the parties could commence negotiations with respect to retirement benefits beginning January 15, 1996. Considering the parties' serious discussions on a DBP Plan which led to the inclusion of the termination provision in the 1994 agreement and ended a two-day strike, the phrase "commence negotiations with respect to retirement benefits" impliedly meant that the parties would commence negotiations on a renewed DBP Plan when the 1994 agreement expired. Thus, the *status quo* was not only an agreement regarding economic wages, but also one concerning a DBP Plan.

The *status quo* test requires that both parties' actions be scrutinized in determining which party first deviated from the *status quo*. Looking first to WPSC, the record illustrates that WPSC rejected a DBP Plan from the outset and never sought to maintain the *status quo*. In his letter to George Becker, WHX President Ronald LaBow conditioned acceptance of a DBP Plan on the Teledyne acquisition. WHX never acquired Teledyne and consequently rejected union demands for a DBP Plan. Furthermore, WPSC rejected the union's formal September 5, 1996 proposal, which included a DBP Plan and was subsequently unwilling to negotiate a DBP Plan at the six main-table discussions that followed. WPSC's proposals offered to extend wages and the temporarily implemented defined-contribution plan, and thus were offers to extend only part of the 1994 agreement. No WPSC proposal offered during the September negotiations sought to maintain the *status quo*.

On the other hand, appellees' actions did seek to maintain the *status quo*. In the January 1996 preliminary meeting on retirement benefits, appellees made demands for a DBP Plan. This was followed by Ronald LaBow's letter conditioning acceptance on the Teledyne acquisition, which was rejected as discussed above. Appellees continued their demands for a DBP Plan and formally proposed that plan during the first main-table discussion. Appellees emphasized the seriousness of that proposal during subsequent talks. WPSC rejected this offer also.

Contrary to what appellants argue, appellees' offer was not conditional. Appellees' offer enveloped a DBP Plan, a term included in the preexisting collective bargaining agreement, and thus was not distinct from the *status quo*. Examination of the record reveals that the board of review misconstrued the *status quo* test in *Bays, supra*, and thus erred in concluding that appellees were not entitled to unemployment compensation because unemployment was "due to a labor dispute other than a lockout." The lower court did not abuse its discretion in reversing the decision rendered by the board of review.

The Ohio Supreme Court in *Bays, supra*, mandates that "the terms of a preexisting collective bargaining agreement" be extended. In other words, the entire contract must be extended. The board of review accepted appellant WPSC's offer to extend only part of the 1994 agreement as an offer to extend the *status quo*. This conflicts with the law set forth in *Bays*.

Additionally, the 1994 agreement bound the parties to negotiate a DBP Plan upon its expiration. WPSC's refusal to discuss a DBP Plan and its continued proposal to extend the 1994 agreement with pension offers significantly less advantageous than the one that the parties had previously agreed to negotiate left appellees with no choice but to discontinue their employment. This situation is indicative of a lockout. See *Bailey, supra*.

WPSC's second assignment of error is found to be without merit.

WPSC's third assignment of error alleges:

"The Common Pleas Court usurped the fact-finding role of the OBES and erroneously found that the Company agreed in the expired collective bargaining agreements to negotiate a defined benefit pension plan."

WPSC argues that the lower court created a finding that WPSC offered to extend only part of the contract. Furthermore, WPSC argues that it never limited its offers to "usual pay for usual work" in its proposals, but instead offered to extend the entire agreement, pension benefits and all. WPSC contends that nothing in the record supports that either party could begin negotiations over a DBP Plan in January 1996. WPSC asserts that the provision that the lower court cited as mandating negotiations over a DBP Plan was merely an obligation to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment," as outlined in Section 8(d) of the National Labor Relations Act, Section 158(d), Title 29, U.S. Code.

The lower court did not usurp the factfinding role of the OBES. The lower court applied the standard set forth in R.C. 4141.28(O)(1) and correctly found that the board of review's decision was unlawful because it misapplied the *status quo* test. Furthermore, the lower court did not fabricate a finding that WPSC offered to extend part of the contract. The record shows that WPSC was unwilling to negotiate a DBP Plan and considered extending only a defined-contribution plan along with certain wage proposals. The record contradicts WPSC's argument that it never intended to negotiate a DBP Plan when the 1994 agreement expired. The hearing officer's examination of James Sray, Human Resources Manager for WPSC, identifies WPSC's actual intentions:

"Q. Now, a little bit of history, you had not had a defined pension benefit plan since the bankruptcy in 1985?

"A. That's correct.

"Q. And you told us that the Pension Benefit Guarantee Corporation would not permit you to have one for a period of five years?

"A. We reached an agreement with the steelworkers and the PBGC that we would not be permitted to have one after five years coming out of bankruptcy.

"Q. And in 1994 in fact what you told us was that in the context of negotiating in that time the company made some representations to the union that although we can't talk about a Defined Benefit Plan now we will talk about one in 1994, isn't that what you told us, excuse me, 1996?

"A.  I said '94 the union put a proposal on the table for DB plan which would come into effect in '96.

"Q.  What do you mean by 'come into effect.'  [T]he proposal would be in effect?

"A.  Yes. The proposal would, yes.

"Q.  And the company said they'd take it up at that time, didn't they?

"A.  We said we'd have discussion on it, yes."

The record establishes that WPSC agreed to discuss a DBP Plan in 1996 and not simply to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment."

WPSC's third assignment of error is found to be without merit.

Appellees' sole cross-assignment of error alleges:

"The Common Pleas Court erred in not finding claimants eligible for benefits in that the status quo was a defined benefit plan, dating back to the time of bankruptcy, which the company entered into 1985 and exited [from] 1991 and in insisting upon a defined benefit plan the employees were upholding the status quo and in refusing to consider or implement a defined benefit plan the company was rejecting the status quo."

Appellees agree with the lower court's decision;  however, they argue that the lower court should have reached that decision on a different theory, namely that the *status quo* was the "last uncontested status preceding the controversy" and not necessarily the then existing contract.  This court has addressed appellees' argument in WPSC's second assignment of error.

Appellees' cross-assignment of error is found to be without merit.

The judgment of the lower court is hereby affirmed.

*Judgment affirmed.*

GENE DONOFRIO, P.J., and VUKOVICH, J., concur.