ADAMSKI ET AL., APPELLANTS, *v.* STATE OF OHIO, BUREAU OF UNEMPLOYMENT COMPENSATION, ET AL., APPELLEES.*
BAHNSON ET AL., APPELLANTS, *v.* STATE OF OHIO, BUREAU OF UNEMPLOYMENT COMPENSATION, ET AL., APPELLEES.*

*Motions to certify the records overruled, May 20, 1959.

(Nos. 5127 and 5128—Decided February 9, 1959.)

Mr. *Francis F. Reno,* for appellants.
Mr. *William Saxbe,* attorney general, and *Messrs. Marshall, Melhorn, Bloch & Belt,* for appellees.

SMITH, J.   Two cases are before this court on appeals on questions of law from the Court of Common Pleas of Lucas County, in which the appellants, some 630 in number, are all similarly situated on claims of benefits under the Unemployment Compensation Act of Ohio.   The two cases are based on substantially identical records filed in this court, were heard together and will be referred to in the singular.   Our conclusion reached in this opinion will be dispositive of both cases.

The appellants, hereinafter called claimants, are all employees of the Champion Spark Plug Company, Toledo, Ohio.   Their claims for benefits were rejected by the administrator, and the board of review upheld the administrator.   Upon appeal to the Court of Common Pleas, that court affirmed the board of review.   No question is raised as to any procedural defects in the several appeals.

The sole question we are called upon to decide is whether the facts revealed in the record sustain the finding of the ad-

ministrator and board of review that, under the provisions of Section 4141.29(C)(2), Revised Code (126 Ohio Laws, 337, 352), claimants' unemployment was caused by a labor dispute (other than a lockout) at the factory, establishment or other premises at which they were employed. There is no evidence, and it is not contended by claimants, that a lockout is involved in the case.

The facts revealed by the record are not in conflict. Counsel argue on the law, without material disputation of the facts.

The board of review found that claimants were last employed by the Champion Spark Plug Company in Toledo, Ohio, and filed claims for benefits during a period subsequent to January 10, 1956; that the Champion Spark Plug Company is a corporation doing business in Toledo, with a plant or division in Hamtramck, Michigan, in the Detroit, Michigan, area, approximately 50 or 60 miles distant; that the Champion Spark Plug Company has entered into a collective bargaining agreement with local unions in each plant, being Local No. 12 in Toledo and Local No. 272 in Hamtramck, Michigan, connected with the parent union, UAW-CIO; that the Toledo plant received ceramic insulators, used in the assembly of its product of spark plugs, from the Hamtramck plant which supplies a major portion of the requirement of the Toledo plant in producing the finished product; that a labor dispute, other than a lockout, occurred at the Hamtramck or Detroit ceramic division on January 10, 1956, over the collective bargaining issues of wages, contract and fringe matters; that by reason of the existence of the labor dispute at the Hamtramck plant, the Toledo plant had its supply of ceramic insulators curtailed to a large degree, and as a consequence claimants lost their employment because of those circumstances; that the labor dispute in the Hamtramck plant was settled on February 29, 1956; that the supply of ceramic insulators from the Hamtramck plant was resumed at once, and the Toledo plant returned to almost full production the following day; and that the major layoff did not occur at the Toledo plant until February 3, 1956, at which time the supply of insulators on hand and workable was exhausted.

The findings of fact are supported by the record. The secretary of Champion Spark Plug Company, T. A. Hill, testified that the company is a corporation with its main plant located

in Toledo, Ohio, and manufactures spark plugs; that its manufacture of spark plugs is started at the Toledo plant but the insulators and cement drives are manufactured at the ceramic division, department or auxiliary plant of the company at Hamtramck, Michigan, a part of the same corporation; that the ceramic plant is under the control of the Toledo offices, all the offices of the corporation being located at Toledo, Ohio; that the insulators and cement drives are transported to the Toledo plant from the Hamtramck plant; that the production of spark plugs at Toledo plant depends on the insulators produced at the Hamtramck plant; that the insulators and silliment are used in Champion spark plugs and no other; that the Hamtramck plant does not have any sales or advertising departments of its own; that the function of the ceramic plant at Hamtramck is to produce insulators and silliment drives essential in the production of spark plugs, and the Toledo plant would not be able to continue functioning without the operation of the Hamtramck plant; that Champion Spark Plug Company maintains a personnel department at the Toledo, Ohio, office, which is responsible for personnel problems both at the Toledo and Hamtramck plants, and for labor negotiations; and that under date of February 2, 1956, as secretary of Champion Spark Plug Company, he sent a letter to the Bureau of Unemployment Compensation at Toledo, Ohio, in which it is stated that Champion Spark Plug Company at its Toledo plant receives the major portion of the ceramic insulators, which are used in the assembly of its sole production of spark plugs, from its ceramic division located on Butler Street, Detroit, Michigan (Hamtramck plant); that the ceramic division is part of the Champion Spark Plug Company, the main offices of which are in Toledo, Ohio; that the employees of the ceramic division have been on strike since January 10, 1956, over collective bargaining issues of wages, contract and fringe matters; that due to this strike the Toledo plant of Champion Spark Plug Company will not have a sufficient number of ceramic insulators to provide work for all its present work forces; and that unless the ceramic division dispute is settled by Saturday, February 3, 1956, it will be necessary to lay off approximately 1,000 workers, effective either on Monday, February 6, or Tuesday, February 7, 1956.

The testimony of George S. Hillier, production superintendent at Hamtramck ceramic division, corroborates the testimony of T. A. Hill, secretary of the company, and further shows that all the patents on machinery at the Hamtramck plant belong to Champion Spark Plug Company, and that nobody else does the work in its particular way; that trucks are sent from Toledo plant to pick up the supply of insulators; that schedules for their production come from Mr. Shedley, at Toledo, Ohio, who sends him a schedule each month and converses with him on the telephone as to what is needed and especially when there is a shortage; that the strike at the Hamtramck plant occurred on January 10, 1956, and ended February 29, 1956, around noon, at which time production was immediately resumed; that at the time trucks were loaded with over a million insulators which were transported to Toledo plant; and that some business connections exist with two separate corporations in Hollerton, Pennsylvania, and Canada.

The testimony of Kermit Schoettley, production manager of Champion Spark Plug Company, shows that the scheduled production of spark plugs at Toledo plant is dependent upon the flow of insulators and silliment from ceramics division at Hamtramck; that it is a part of his duties to synchronize and integrate the production both at Hamtramck and Toledo plants; that on January 10, 1956, the supply of insulators from the Hamtramck plant was stopped, and Mr. Hillier advised that there would be no more insulators until further notice, because of work stoppage or strike at Hamtramck; that immediately he rescheduled production of spark plugs in Toledo plant; that normal operations at the Toledo plant could not be maintained by insulators made at the Cambridge, Ohio, plant of the company; that no insulators are manufactured at the Toledo plant, which is not equipped therefor; that, pending cessation of supplies, the Toledo plant utilized all its available inventory, and they were able to operate the Toledo plant at about two-thirds of capacity or 50 per cent production; that the Cambridge plant could produce 200,000 insulators, and the usual daily needs of Toledo plant were 740,000 insulators; and that he is in contact with Hamtramck plant daily by telephone, and insulators are delivered daily by Toledo plant trucks.

The testimony of B. H. Sibley, vice president of the Champion Spark Plug Company in charge of manufacture, shows that his duties involve the Toledo, Ohio, Hamtramck, Michigan, and Cambridge, Ohio, plants which are the corporation entity of the Champion Spark Plug Corporation; and that he caused the following notice, under date of February 3, 1956, over his signature, to be published by furnishing a copy to each one of the general foremen in charge of each department, and it was posted on all bulletin boards and one copy directed to the executive committee of the union at the Toledo plant:

"Notice—because of failure to reach satisfactory agreement in the ceramics division in Detroit (Hamtramck), it is necessary to reduce production in Toledo plant. Male employees hired after January 1, 1945, and female employees hired after September 30, 1942, are hereby laid off until further notice. When the plant resumes normal production, notice of recall will be advertised in the Toledo Blade and all employees will then return to their regular job classification and shifts."

Mr. Sibley's testimony further shows that all employees of Champion Spark Plug Company were recalled at his direction in a notice published in the Toledo Blade newspaper on or about February 28 or February 29, 1956, to resume work Thursday, March 1, 1956; that the sole reason for the notice and the lay-offs they involved was the stoppage of production at the Hamtramck plant; that the cash from which employees of the Hamtramck plant are paid comes from the Toledo, Ohio, office; that Champion Spark Plug Company has operated the ceramic division in Hamtramck for 36 years; and that it would not be possible for the Toledo plant to continue functioning under the present setup, if the Hamtramck plant were out of existence.

The inescapable conclusion of fact is that claimants' temporary unemployment at the Toledo, Ohio, plant was caused directly and proximately by a labor dispute at the Hamtramck, Michigan, plant of Champion Spark Plug Company. Collective and concerted discontinuance of work for the purpose of obtaining better terms and improved conditions constituted a strike and, a fortiori, a labor dispute. *Baker Co.* v. *Powhatan Mining Co.,* 146 Ohio St., 600, 67 N. E. (2d), 714.

Claimants would be entitled to unemployment benefits un-

less they are ineligible therefor or disqualified by the provisions of Section 4141.29(C)(2), Revised Code, which are as follows:

"(C) Notwithstanding division (A) of this section, no individual may serve a waiting period or be paid benefits for the duration of any period of unemployment with respect to which the administrator finds that such individual:

"* * *

"(2) Lost his employment or has left his employment by reason of a labor dispute other than a lockout at the factory, establishment, or other premsies at which he was employed, as long as such labor dispute continues, and thereafter for a reasonable period of time necessary for such factory or establishment to resume normal operations."

The facts in the case and their significance in light of the above provisions of Section 4141.29(C)(2), Revised Code, raise a mixed question of law and fact.

A salutary rule to be kept in mind by the court in consideration of the language of the statute is that it is beyond the prerogative of the courts to enlarge or restrict the meaning of the words of the statute, under the guise of interpretation or consrtuction thereof. Section 4141.46, Revised Code, provides for a liberal construction of the statute. The settled rule is that the intent or purpose shall be chiefly gathered from the language employed in the statute. If it is a remedial statute it is to be liberally construed in favor of persons to be benefited, but a liberal construction should not result in the exercise of the legislative power of amendment under the mask of so-called interpretation. *State, ex rel. Maher, Pros. Atty.,* v. *Baker,* 88 Ohio St., 165, 102 N. E., 732. Construing an exemption statute, it is said in *Dennis* v. *Smith,* 125 Ohio St., 120, 180 N. E., 638:

"* * * By 'liberal construction' is not meant that words shall be given an unnatural meaning, or that the meaning shall be enlarged or expanded to meet a particular state of facts. A liberal construction must still be a fair and reasonable one, in an effort always to ascertain the legislative intent."

To read into a statute a legislative meaning or intent, which digresses from the scope and application thereof, reasonably demonstrated by the language used, constitutes an impingement,

trespass and erosion by the judiciary of the sole prerogative of the Legislature, representative of the will of the people, to enact the law within the framework of the Constitution.

The board of review construed the word, "establishment," in the statute to embrace the plant of the Champion Spark Plug Company located in Hamtramck, Michigan. The decision of the board was that claimants lost their employment by reason of a labor dispute, other than a lockout, at the factory, establishment or other premises at which they were employed, and denied the claims. In support of its ruling, the board relied upon the cases of *McGee* v. *Timken Roller Bearing Co.* (unreported), decided May 14, 1956, by the Court of Appeals for Muskingum County (motion to certify the record overruled by the Supreme Court October 31, 1956); *Spielman* v. *Industrial Commission* (1940), 236 Wis., 240, 295 N. W., 1; *Chrysler Corp.* v. *Smith* (1941), 297 Mich., 438, 298 N. W., 87, 135 A. L. R., 900; and *Park* v. *Appeal Board of Michigan Employment Security Commission,* Circuit Court for the County of Wayne, Michigan, Nos. 280754; 280866; 280901, decided July 26, 1956. Since the hearing in the case before this court, the Supreme Court of Michigan, on January 12, 1959, reversed the Wayne County Circuit Court in *Park* v. *Appeal Board of Michigan Employment Security Commission,* 355 Mich., 103, 94 N. W. (2d), 407, and also overruled its decision in *Chrysler Corp.* v. *Smith, supra,* to the extent that that case adopted "integral functioning" as the basic test of the extent of "the establishment" under the Michigan act. Thus, under the somewhat analogous facts, the final result in the *Chrysler Corp.* v. *Smith case* is consonant with the holding of the Ohio court in *McGee* v. *Timken Roller Bearing Co., supra.*

If it were not for the reversal of its position by the Michigan Supreme Court, we would affirm the Common Pleas Court of Lucas County, Ohio, without further discussion, although the Michigan statute has some significant provisions dissimilar to those of the Ohio act.

Generally, the statutes of the several states disqualify a claimant for unemployment benefits where a labor dispute caused the unemployment at the establishment, factory, or other premises where he was employed. The interpretation of these terms has frequently come before the courts, with various re-

sults. In 28 A. L. R. (2d), 324, the cases up to 1953 have been collected and discussed. The cases appear to fall into three broad categories based upon tests of (1) functional integrality, (2) geographical location or physicial proximity, or (3) a combination of those tests which should not be adopted as absolute in all cases, but comprise elements to be considered from the standpoint of the scheme of management, supervision, production of each plant, authority of those operating plant, hiring, paying and discharging employes, methods of making purchases and sales, and all other relevant and kindred matters. The following cases, among others in several states, recognize this rule which Michigan now has adopted.

*Nordling* v. *Ford Motor Co.*, 231 Minn., 68, 42 N. W. (2d), 576, 587, 28 A. L. R., 900; *General Motors Corp.* v. *Mulquin*, 134 Conn., 118, 55 A. (2d), 732; *Snook* v. *International Harvester Co.* (Ky.), 276 S. W. (2d), 658; *Mountain States Tel. & Tel. Co.* v. *Sakrison*, 71 Ariz., 219, 225 P. (2d), 707.

The case of *Chrysler Corp.* v. *Smith, supra* (297 Mich., 438), turned on the test of integration and held that an "establishment" under the simplest definition and common sense understanding is merely something established, and that the purpose and use of the creation, if to accomplish an end in which all units are participants in bringing it about, constitute the units, so synchronized and employed in accomplishment of a common end, an "establishment" within the meaning of the term used in the statute, and that the employer's main automobile plant and other plants located nearby in areas within the state, when functionally integrated and highly synchronized with the main plant, constituted one establishment within the meaning of the statute.

In *Park* v. *Appeal Board of Michigan Employment Security Commission, supra* (355 Mich., 103), wherein the Ford Motor Company was involved, the Supreme Court overruled the *Chrysler Corp. case* renouncing the absolute test of functional integrality and adopted the comprehensive test of all relevant particular facts considered together in a given case, and in that case it was held that a strike in the forging plant in Canton, Ohio, was not a part of the Ford Company establishment for purposes of unemployment benefits validating the claims of em-

ployes in the Detroit, Michigan, plant. We point out that the court relied heavily upon the extensive declaration of legislative policy set forth in the statute. Further, it should be noted that the Michigan act provides an exemption to disqualification because of a labor dispute if claimant shall establish that he is not directly involved in such dispute.

The Ohio Unemployment Compensation Act before us does not contain a declaration of policy. Furthermore, the question of participation or interest in the labor dispute has no bearing upon the question of disqualification. *Cornell, Admr.,* v. *Bailey,* 163 Ohio St., 50, 125 N. E. (2d), 323. These distinctions alone vitiate the *Park case* as a controlling precedent in the consideration of the case at bar. The Supreme Court of Michigan aligns itself with some eight or nine other state courts in holding that the statutory sense of the term, ''establishment,'' is not embracive of the whole of Ford's vast and far-flung enterprise as a single industrial unit. The statutes involved are not identical in their general provisions. The rationale of those decisions is based on the particular fact that Ford is a world-wide enterprise, rather an empire with autonomous principalities, and transcends the term ''establishment.'' Such facts are not present in the case before us nor are they analogous to a decision here involving Champion Spark Plug Company on the particular facts in this record.

It appears to us that the aforesaid comprehensive test or rule is the better and more persuasive in reason and soundness. Applying such test to the facts in the case before us, we find that the test of functional integrality is fully satisfied by the evidence that the Hamtramck plant of employer is under the control of the Toledo offices, the only offices of the corporation; that the production of spark plugs at Toledo plant depends on insulators produced at the Hamtramck plant which are used only in Champion spark plugs; that the function of the ceramics plant at Hamtramck is to produce insulators for the Toledo plant which would not be able to continue functioning without its Hamtramck plant; that the machinery in the Hamtramck plant is patented in the employer's name, and insulators are made thereby in a particular way not otherwise available; that the Toledo plant controls the schedules of production and is de-

pendent on the flow of insulators from the Hamtramck plant; and that it would not be possible for the Toledo plant to continue functioning if the Hamtramck plant were out of existence.

The test of geographic location or physical proximity is satisfied by the evidence that the Hamtramck plant is some 50 or 60 miles distant, and that trucks are sent daily from Toledo plant to transport the insulators from Hamtramck plant to the Toledo plant.

These tests should be combined with all further relevant facts and particularly that the Toledo plant maintains a personnel office in Toledo which is responsible for personnel problems, both in the Toledo and Hamtramck plants; that the Hamtramck plant does not have any sales or advertising departments; and that the cash from which employees of Hamtramck plant are paid comes from the Toledo plant.

The case of *Spielman* v. *Industrial Commission, supra* (236 Wis., 240), cited by the board, bears close analogy to the case before us. While the rule of interpretation was expressed as "physical proximity, functional integrality and general unity," the comprehensive rule may be said to be inherent in its decision.

That part of the subject statute, formerly Section 1345-6, General Code, has received interpretation in Ohio in the case of *McGee* v. *Timkin Roller Bearing Co., supra,* decided in 1956. In construing and applying the provisions of the statute to the particular facts of the case, it is stated:

"During the time mentioned there was a strike in the Canton plants of The Timken Roller Bearing Company. The claimants were employees of the company in certain buildings in the city of Zanesville, although they were not upon strike. As a result of the strike in Canton the materials in stock at the Zanesville plant were exhausted and could not be replenished, and, consequently, there was no work for the Zanesville employees.

"There was no permanent structure at that time owned by the company in Zanesville, but it had rented three unused garages for certain purposes in connection with its operation. The operations in Zanesville did not produce the tapered roller bearings from raw material, but it seems to be unquestioned that the

work at Zanesville consisted only of inspection and assembly of parts sent from Canton to Zanesville; that the work in Zanesville was utterly dependent upon the supplied bearing furnished from Canton.

"There was no payroll department in Zanesville, and all payroll records were prepared and transmitted from Canton where the checks were made up and forwarded to Zanesville for distribution.

"While the labor dispute was in Canton and not in Zanesville, yet the integration between the two plants was such that the Zanesville employees lost their employment temporarily by reason of a labor dispute in the factory, 'establishment, at which they were employed.' A geographical difference of 90 miles seems to us to be of no consequence in view of these undisputed facts. * * * Certainly, under the record, these claimants lost their employment temporarily 'by reason of a labor dispute (other than a lockout) at the factory, establishment, or premises at which they were employed,' and this, in spite of the geographical distance."

The conclusion of the court comes within the comprehensive test of considering all relevant particular facts in the given case when construing the words, "factory, establishment or other premises."

It is difficult to see how such conclusion would be different if the one plant of the company was located just over the state line of Ohio and in an adjoining state. The fact still remains that the employee lost his employment by reason of a labor dispute in the establishment of the employer. Notwithstanding the definition of single employer in Section 4141.01, Revised Code, to wit, "all individuals performing services for an employer of any person in this state who maintains two or more establishments within the state are employed by a single employer, for the purpose of such sections," the employer who has such plant in his establishment is amenable to the Ohio act and the requirements thereof to pay into the benefit fund, and the employees to be paid benefits under the conditions therein prescribed. Nor does such definition restrict or limit the broad sense and meaning of the word, "establishment," employed by the Legislature, which it did not choose to place in the preamble of definitions.

The statute does not exempt the employer because a part of his business establishment lies over the state line. An application of the definition as to employer rate of payment into the fund may be found in *Eiber Realty Co.* v. *Dunifon, Admr.*, 84 Ohio App., 532, 82 N. E. (2d), 565, and *Morrison* v. *Cornell, Admr.*, 103 Ohio App., 263, 145 N. E. (2d), 140. The doctrine of *noscitur a sociis* does not restrict the meaning of the word, "establishment," for the purpose of reading into the statute a restrictive sense the Legislature apparently did not intend to convey. The courts, in the many cases examined, have conducted a seminar in semantics to which we allude without unnecessarily extending this opinion. Certainly a presumption prevails that the Legislature had full knowledge and information as to the subject matter of the statute and the existing conditions and relevant facts relating thereto, such as the structure of modern industry, its business establishment, large as well as small, and the ramifications of its manufacturing process. 82 Corpus Juris Secundum, 541; *United States* v. *Champlin Refining Co.*, 341 U. S., 290, 95 L. Ed., 949, 71 S. Ct., 715; *Irvine Co.* v. *California Employment Commission*, 27 Cal. (2d), 570, 165 P. (2d), 908.

The intention of the Legislature in the use of the word, "establishment," is made additionally manifest by a review of the statute by the Supreme Court of Ohio in *Cornell, Admr.*, v. *Bailey, supra* (163 Ohio St., 50). In the opinion of Stewart, J., at page 56, it is said:

"Not only has Ohio not provided a so-called 'escape' clause for those who, without fault on their part, lose their employment by reason of a labor dispute, but our General Assembly has affirmatively declined to provide such an 'escape' clause."

This language is in reference to participation or nonparticipation of an employee in the labor dispute. The Legislature emphatically declined an amendment to that effect. And of importance to the case before us, the Legislature likewise refused to enact an escape clause pertaining to "establishment," to wit:

"C. He has not voluntarily stopped working, other than at the direction of his employer, in sympathy with employes in his own or some other establishment or factory in which a labor dispute is in progress.

"If, in any case, separate plants which are commonly con-

ducted as separate businesses, are located in separate premises which are not on the same, adjoining, or physically proximate property, *each plant will for the purpose of the foregoing provisions, be deemed to be a separate factory, establishment, or other premises.*" (Emphasis added.)

Obviously, the broad sense of the word, "establishment," in the statute remained intact. What the Legislature omits, the courts can not supply. Laudable and praiseworthy as we believe the objects of the statute to be for the relief of hardship of unemployment, in arriving at a considered judicial conclusion upon the facts in this case and application of the statute thereto, we are not permitted to indulge a pre-occupation as to the consequences of a decision as to any of the litigants. That belongs to the legislative branch of our government.

Claimants, by virtue of the statute, had the burden of proving their eligibility, without disqualification, to unemployment benefits. *Shannon* v. *Bureau of Unemployment Compensation*, 155 Ohio St., 53, 97 N. E. (2d), 425. In *Brown-Brockmeyer Co.* v. *Roach,* 148 Ohio St., 511, 518, 76 N. E. (2d), 79, it is said:

"The decision of purely factual questions is primarily within the province of the referee and the board of review. The courts reverse such decisions only when found to be contrary to law or against the weight of the evidence."

Section 4141.28, Revised Code, reads, in part, as follows:

"* * * If the court finds that the decision was unlawful, unreasonable, or against the manifest weight of the evidence, it shall reverse and vacate such decision or it may modify such decision and enter final judgment in accordance with such modification; otherwise, such court shall affirm such decision. * * *"

Upon a careful examination of the record herein and the law applicable thereto, this court, hearing this matter on appeal, finds the decision of the Common Pleas Court is not against the manifest weight of the evidence or unlawful or unreasonable.

The judgments of the Court of Common Pleas in the two cases are, therefore, affirmed.

*Judgments affirmed.*

FESS, J., concurs.
DEEDS, J., dissents.

212

Fess, J., concurring. The simple but exceedingly difficult problem confronting us is whether the two plants of the employer, one in Toledo and the other 60 miles away in the Detroit area, constitute a "factory, establishment or other premises" within the purport and meaning of the phrase as employed in Section 4141.29(C), Revised Code.

As has been cogently remarked: "'The relative recency of the [unemployment compensation] law and the paucity of judicial decisions thereon create historical nuances rather than historical facts, which are of only small import in a historical interpretation of the true purpose of the act." *Tennessee Coal, Iron & R. Co.* v. *Martin,* 251 Ala., 153, 36 So. (2d), 547, 548. Another court has said: "Until more cases involving a wide variety of factual situations have been brought to the courts, judicial answers will necessarily lack the usual rigor of legal formulas, and tend to be tentative and groping in their nature. Concrete cases will develop general principles, and precise definition will issue from the wisdom acquired by greater experience." *Sturdevant Unemployment Compensation Case,* 158 Pa. Super., 548, 45 A. (2d), 898, 902.

At the outset, it is to be stated that there is a vast difference between the far-flung industrial empire of the Ford Motor Company, having some 23 or more plants throughout the land under more or less autonomous management, sought to be treated as a single establishment, and the circumstances presented by the two Champion plants involved in the instant case. Each of the eight Ford cases allowing compensation[1] are readily distinguish-

[1]*Nordling* v. *Ford Motor Co.,* 231 Minn., 68, 42 N. W. (2d), 576, 28 A. L. R. (2d), 272; *Ford Motor Co.* v. *Division of Employment Security,* 326 Mass., 757, 96 N. E. (2d), 859; *Ford Motor Co.* v. *New Jersey Dept. of Labor and Industry,* 7 N. J. Super., 30, 71 A. (2d), 727, affirmed, 5 N. J., 494, 76 A. (2d), 256; *Ford Motor Co.* v. *Kentucky Unemployment Compensation Commission,* 243 S. W. (2d), 657; *Machcinski* v. *Ford Motor Co.,* 277 App. Div., 634, 102 N. Y. Supp. (2d), 208; *Ford Motor Co.* v. *Unemployment Compensation Board of Review,* 168 Pa. Super., 446, 79 A. (2d), 121; *Ford Motor Co.* v. *Unemployment Compensation Commission,* 191 Va., 812, 63 S. E. (2d), 28; *Park* v. *Appeal Board of Michigan Employment Security Commission,* 355 Mich., 103, 94 N. W. (2d), 407.

The single case disallowing compensation is *Ford Motor Co.* v. *Abercrombie,* 207 Ga., 464, 62 S. E. (2d), 209.

able upon the facts and also because the statutes of such states in the main materially differ from the Ohio act.[1]

Notwithstanding the Ford cases are distinguishable, some assistance is gleaned from the principles enunciated and the tests applied in reaching their conclusions.

1. In general, the decisions are premised upon the laudable purpose of the several acts to relieve hardships caused by unemployment due to no fault of the employees.

2. The acts are remedial in nature and a liberal construction is to be accorded the granting of compensation. Disqualifying provisions are to be narrowly construed.

3. In the absence of a statutory definition, words and phrases are to be given their ordinary (dictionary) connotation.[3]

4. Construction of the word, "establishment," at which one is employed is to be determined from the standpoint of employment rather than that of management.

5. There is no important distinction to be drawn from the word, "establishment," in contrast with the phrase, "factory, establishment or other premises."

---

The Ohio Unemployment Compensation Board of Review, upon appeals of Abnie and others, disallowed compensation to claimants who lost their employment in the Canton and Hamilton, Ohio, plants as a result of the River Rouge strike in Detroit, on the finding that the Ohio plants were part of the same "factory, establishment or other premises" as Ford assembly lines in Detroit. That decision was not appealed.

[2]With the exception of New York, the states wherein those cases arose all have so-called escape clauses relating to direct or sympathetic participation in strikes and separate branches of work as separate units of employment. For example, the Michigan act provides "that no individual shall be disqualified under this section if he shall establish that he is not directly involved in such dispute" unless direct participation be established according to defined circumstances. The Ohio General Assembly has refused to enact such so-called "escape" clauses. *Cornell, Admr.*, v. *Bailey*, 163 Ohio St., 50, 125 N. E. (2d), 323.

[3]In Ohio, in the absence of statutory or judicial definition, the court is privileged to turn to the dictionary. *Richards* v. *State*, 110 Ohio St., 311, 315, 143 N. E., 714. But in *State, ex rel. Belford*, v. *Hueston*, 44 Ohio St., 1, 7, 4 N. E., 471, Spear, J., says: "Where a word is reconcilable with law or established custom in the particular manner in which it is used, a different meaning can not be given to it upon authority of a lexicographer." See, also, *Baker* v. *Powhatan Mining Co.*, 146 Ohio St., 600, 67 N. E. (2d), 714; *Mutual Bldg. & Investment Co.* v. *Efros*, 152 Ohio St., 369, 89 N. E. (2d), 648.

6. The phrase, "factory, establishment or other premises," or, "establishment at which the person was employed," denotes a definite geographic locality or place of employment.

7. Functional integrality or interdependent syncronization, general unity, physical proximity and other pertinent factors are to be considered as tests in determining whether separate plants, activities or functions constitute an establishment.[4]

Functional integrality alone is insufficient.[5]

8. In states having a nonstrike participation escape clause, in the absence of direct participation, claimants are not chargeable or responsible for the acts of international officers of the union, to which claimants belong, in calling a strike in another state.[6]

9. Administrative determination is not conclusive.[7]

Otherwise an appeal therefrom would be ineffective. But such administrative determination is persuasive. It is of some significance that in most of the Ford cases the administrative decisions were affirmed.

In none of the Ford cases are the tests of functional integrality, proximity and general unity rejected, but functional integrality is definitely rejected as an absolute (*Nordling* v. *Ford Motor Co., supra*) or basic (*Park* v. *Appeal Board, supra*) test. And it appears to be recognized in such cases that functional integrality, close proximity, general unity and other fac-

---

[4]*Nordling* v. *Ford Motor Co., supra* (231 Minn., 68). Cf. *Snook* v. *International Harvester Co.* (Ky., 1955), 276 S. W. (2d), 658, disallowing compensation and distinguishing *Ford Motor Co.* v. *Kentucky Unemployment Compensation Commission, supra* (243 S. W. [2d], 657).

[5]In the Ford cases there was a large degree of functional integrality, but there was absent the factor of physical proximity. See, also, *Tucker* v. *American Smelting & Refining Co.*, 89 Md., 250, 55 A. (2d), 692, holding that a Utah copper smelter which supplied blister copper to a Baltimore refinery was not one establishment.

[6]Claimants who refuse to cross picket lines are denied compensation on the ground that they are voluntarily quitting employment rather than on the ground of participation in the strike.

[7]The acts of several states provide that administrative findings of fact are conclusive and the reviewing courts do not consider contra evidence. In Ohio, the reviewing court is required to determine whether the decision is unreasonable, unlawful or manifestly against the weight of the evidence. *Brown-Brockmeyer Co.* v. *Roach*, 148 Ohio St., 511, 76 N. E. (2d), 79.

tors may warrant a conclusion that several plants are a single factory or establishment. To the writer it seems that, as a matter of fact, close proximity is merely an element to be considered incident to applying the test of integrality. If a plant supplying component parts for the manufacture of a product at the main plant is near enough to permit functional integrality and unitary supervision, the former is a part of the main establishment.[8]

The Ohio Unemployment Compensation Board of Review has consistently regarded integrality and proximity as factors in determining eligibility for compensation.[9]

---

[8] In *Chrysler Corp.* v. *Smith* (1941), 297 Mich., 438, 298 N. W., 87, 135 A. L. R., 900 (now modified if not overruled in *Park* v. *Appeal Board, supra*), various coordinated plants synchronized and employed within an area of eleven miles were held to be a single establishment. In *Park* v. *Appeal Board, supra* (355 Mich., 103), the Canton, Ohio, forge plant was over 150 miles from the Rouge plant. In *General Motors Corp.* v. *Mulquin* (1947), 134 Conn., 118, 55 A. (2d), 732, disallowing compensation, the two plants were eighteen miles apart. In *Spielman* v. *Industrial Commission* (1940), 236 Wis., 240, 295 N. W., 1, disallowing compensation, the plants were 40 miles apart. In *Snook* v. *International Harvester Co., supra* (276 S. W. [2d], 658), the plants were in the same immediate vicinity. In *McGee* v. *Timken Roller Bearing Co.* (1956, Ohio Court of Appeals, Fifth Appellate District), disallowing compensation, the plants were ninety miles apart.

In a case arising under the Fair Labor Standards Act, the Supreme Court of the United States has recognized the factor of integrated work as a test. *Rutherford Food Corp.* v. *McComb, Admr.* (1947), 331 U. S., 722, 726, 91 L. Ed., 1772, 67 S. Ct., 1473.

[9] Alexander Besozzi, Appeals Docket No. 124367, involving disinterested employees of a coal mine, whose entire output was used by Universal Sewer Pipe, who were idled by a strike of clayworkers. Dorothy L. Bradford, Appeals Docket No. 12811, benefits denied to employees of Deisel-Wemmer Corp. in Van Wert, incident to a strike in the Lima unit which prevented transfer of materials for manufacture of cigars at Van Wert. Theodore L. Turcy, Appeals Docket No. 12634, a claimant employed in Ohio and West Virginia as a circulation supervisor of the Pittsburgh Press, who became unemployed due to a strike in the trucking and mailing department of the newspaper in Pittsburgh. Anna L. Adams, Appeals Docket No. 74836, Galion, Ohio, unit supplying material to a Mt. Gilead unit halted by a strike at Galion plant. John H. Bell, Appeal Docket No. 119996, another case involving layoff of an employee in a sewer pipe manufacturing company as a result of a strike at employer's coal mine 13 miles away. *Lois McKee* v. *Timken Co.*, Appeals Docket No. 38517, reversed upon appeal to Common Pleas Court which in turn

Administrative interpretation of a given law, while not conclusive, is, if long continued, to be reckoned with most seriously and is not to be disregarded and set aside unless judicial construction makes it imperative to do so. *Industrial Commission* v. *Brown*, 92 Ohio St., 309, 311, 110 N. E., 744; *State, ex rel. Automobile Machine Co.*, v. *Brown, Secy. of State*, 121 Ohio St., 73, 76, 166 N. E., 903; *State, ex rel. Schweinhagen*, v. *Underhill, Clerk*, 141 Ohio St., 128, 132, 46 N. E. (2d), 861; *Miami Conservancy Dist.* v. *Bucher*, 87 Ohio App., 390, 95 N. E. (2d), 226; *Tasich* v. *Board of Liquor Control*, 95 Ohio App., 377, 119 N. E. (2d), 659; *Wadsworth* v. *Dambach*, 99 Ohio App., 269, 280, 133 N. E. (2d), 158; 82 Corpus Juris Secundum, 761. Of course, administrative practice can not prevail over the clear requirements of a statute prescribing a different procedure, *State, ex rel. Morris*, v. *Industrial Commission*, 134 Ohio St., 380, 17 N. E. (2d), 741; *State, ex rel. Brooks Equipment & Mfg. Co.*, v. *Evatt, Dir.*, 137 Ohio St., 125, 28 N. E. (2d), 360, particularly where the language of the statute is so plain and unequivocal as to admit of but one interpretation. *State, ex rel. Kildow*, v. *Industrial Commission*, 128 Ohio St., 573, 581, 192 N. E., 873.

It is contended that by reason of the last sentence in Section 4141.01(A), Revised Code, an out-of-state plant is excluded from an establishment in Ohio. Section 4141.01, *inter alia*, undertakes to define "employer" as including any individual or type of organization, corporate or otherwise, having in employment three or more individuals at any one time within a calendar year. The last sentence of subparagraph (A) recites:

"All individuals performing services for an employer of any person *in this state* who maintains two or more establishments *within this state* are employed by a single employer for the *purpose of such sections* [4141.01 to 4141.46, inclusive]." (Emphasis supplied.)

This paragraph undertakes to define the word, "employer," as the term is employed throughout the act and incident thereto

---

was reversed by Court of Appeals, May 14, 1956. Cleve Abnie, Appeals Docket No. 114192, employees of Ford Canton and Hamilton, Ohio, plants laid off as a result of the Ford strike·at the main plant in Michigan.

See, also, 10 Ohio State Law Journal, 244 *et seq.*

refers to a "single employer." Although a number of other terms are defined in the section, the word, "establishment," is not defined.

As the writer construes the quoted sentence, it prevents an employer from avoiding the provisions of the act by employing two persons only in each of two establishments in the state. It also treats as a single employer one who maintains two or more establishments within the state, regardless of whether the operations in the separate establishments are integrated or not and regardless of whether separate types of businesses are conducted therein. As a result of this sentence, an employer having two or more establishments within Ohio has a single account and, for merit rating, his contributions are computed upon the basis of his over-all unemployment experience in the several establishments he operates. See *Eiber Realty Co.* v. *Dunifon, Admr.,* 84 Ohio App., 532, 82 N. E. (2d), 565.

Furthermore, the reason why the phrase, "two or more," rather than, "one or more," is employed is because an employer having but one establishment is covered by the first paragraph in subparagraph (A). The quoted sentence makes no reference to an establishment outside the state for the obvious reason that employees of an Ohio employer outside Ohio are presumably covered by the foreign state and are not amenable to the Ohio act.[10]

The definition is limited to the meaning of the word, "employer," as used throughout the act and has no application to the word, "establishment," or the phrase, "factory, establishment or other premises," as used in Section 4141.29(C)(2), Revised Code, other than tending to indicate that the term, "establishment," may have been intended to be used in its singular sense.[11]

---

[10]See subparagraph (B) (1) (a) and (b) of Section 4141.01, Revised Code, relating to casual or other employment outside Ohio.

[11]Cases in other jursidictions allowing compensation have referred to somewhat similar definitions as indicative of a legislative intention to treat two or more establishments as separate units of employment, but none of these decisions (with the possible exception of *Park* v. *Appeal Board*) have construed the provision as *ipso facto* excluding from the labor dispute disqualification provision a part of an establishment located in another

In the absence of a statutory or Ohio judicial definition of the phrase, "factory, establishment or other premises," when we are confronted with conflicting contentions as to the meaning which the General Assembly intended, the writer has given serious concern to the applicability of Section 4141.46, Revised Code, requiring that the sections of the act shall be liberally construed. In *Baker* v. *Powhatan Mining Co., supra* (146 Ohio St., 600), the court refers to the underlying purpose of the act to lighten the burden of unemployment and that it was designed for the benefit of those whose loss of employment is involuntary, but not those who might be voluntarily unemployed. But the court held that the word, "strike," as then employed in the disqualifying section, instead of "labor dispute," included cessation of work pending negotiation of a new collective bargaining agreement. In that case there was a definite dispute with respect to the meaning of the word, "strike," but the court, without reference to applying the statutory rule of liberal construction, broadened the term to include cessation of work notwithstanding the fact that it could well have concluded that the claimants voluntarily quit work.[12]

Again, in *Cornell, Admr.,* v. *Bailey, supra* (163 Ohio St., 50), the claimants were not members of the striking union, were not concerned with the dispute and did not participate in the dispute or strike in any way. The court held that those claimants who quit their employment in sympathy with the strikers *left* their employment and those who were involuntarily deprived of their employment *lost* their employment by reason of a labor dispute. In referring to the failure of the 98th General Assembly to enact the proposed "escape clause," the court, at page 57, says:

"It seems manifest from the preceding legislative history that the General Assembly positively intended that any person

state. *Ford* v. *New Jersey Dept. of Labor & Industry, supra*; *Nordling* v. *Ford Motor Co., supra*; *Ford Motor Co.* v. *Kentucky Unemployment Compensation Commission, supra*: *Park* v. *Appeal Board, supra*.

[12]See, also, *Unemployment Compensation Commission of Alaska* v. *Aragon* (1946), 329 U. S., 143, 91 L. Ed., 136, 67 S. Ct., 245; and *American Hawaiian Steamship Co.* v. *California Employment Comm.* (1942), 128 P. (2d), 627, affirmed, 24 Cal. (2d), 716, 151 P. (2d), 213.

who loses his employment voluntarily or involuntarily, as a result of a labor dispute, shall not be eligible for unemployment benefits as long as that labor dispute continues.''[13]

In *Cornell, Admr.,* v. *Bailey, supra,* the court in reaching its conclusion that the claimants were disqualified from receiving benefits refers to the rejection by the General Assembly of an ''escape clause'' amendment to the statute. See, also, *State, ex rel. Shafer,* v. *Ohio Turnpike Commission,* 159 Ohio St., 581, 588, 113 N. E. (2d), 14, referring to the rejection of an amendment as persuasive in construing the provision of the statute under consideration. It is, therefore, significant that since the 1949 session of the General Assembly it has not seen fit to enact any so-called ''escape'' clause at subsequent sessions.

In *Shannon* v. *Bureau of Unemployment Compensation,* 155 Ohio St., 53, 97 N. E. (2d), 425, in the absence of a statutory provision relating thereto, the court held that the burden of proof is upon the claimant to establish the right to unemployment compensation and also that the phrase, ''available for work,'' as used in the statute implies some obligation on the part of the claimant to make reasonable effort to obtain work. See dissenting opinion referring to the statute enjoining liberal construction. See, also, *United Steelworkers of America* v. *Doyle, Claims Supr.,* 168 Ohio St., 324, 154 N. E. (2d), 623, and *Zanesville Rapid Transit, Inc.,* v. *Bailey,* 168 Ohio St., 351, 155 N. E. (2d), 202, wherein decisions construing statutory provisions adverse to claimants were rendered. Contra, *Acierno* v. *General Fireproofing Co.,* 166 Ohio St., 538, 144 N. E. (2d), 201.

It thus becomes apparent that the statutory admonition of liberal construction has not prevented the courts of Ohio from applying a disappointing but reasonable construction in the ascertainment of the legislative intent.

Authorities in other jurisdictions more closely analogous

---

[13]In *Allen* v. *Youngstown Municipal Ry. Co.* (1954), 72 Ohio Law Abs., 35, bus operators went on strike without setting up picket lines or doing anything to prevent other employees from reporting for work. Maintenance employees who involuntarily lost their employment by reason of the labor dispute were held disqualified, the court stating: ''The law makes no difference between individuals who are actively on strike and those who innocently lose their work because of a strike. Both were disqualified.''

upon the facts as well as the law to the situation presented in the instant case are *Spielman* v. *Industrial Commission, supra* (236 Wis., 240); *Matson Terminals* v. *California Employment Commission* (1944), 24 Cal. (2d), 695, 151 P. (2d), 202; *General Motors Corp.* v. *Mulquin, supra* (134 Conn., 118); and *Mountain States Tel. & Tel. Co.* v. *Sakrison* (1950), 71 Ariz., 219, 225 P. (2d), 707. But in resolving the question, we need not go beyond Ohio unless we disagree with the conclusion reached by the Fifth Appellate District Court of Appeals in *McGee* v. *Timken Roller Bearing Co.*[14]

Upon authority of those cases, it is, therefore, concluded that the Common Pleas Court did not err in failing to find that the decision of the Unemployment Compensation Board of Review was unlawful, unreasonable or against the manifest weight of the evidence, and that the judgment should be affirmed.

DEEDS, J., dissenting. I do not concur in the conclusion reached by the majority members of this court. I am in accord with the conclusion arrived at in the decision of the Supreme Court of the State of Michigan in the case of *Park* v. *Appeal Board of Michigan Employment Security Commission*, 355 Mich., 103, 94 N. W. (2d), 407.

The two headnotes to that case, as reported in the Commerce Clearing House Unemployment Compensation Reports, considered pertinent here, are as follows:

"Workers employed at three of an automobile manufacturer's Detroit plants were laid off as a result of a strike at a Canton, Ohio, forgings plant owned by the same manufacturer. It is held that the 'functional integration' of an employer's plants that are located in more than one state does not make the plants a single 'establishment' within the meaning of the law. Therefore, employees out of work in Michigan as a result of a strike against their employer in Ohio are not disqualified under the labor-dispute provisions of the law, where such employees did not strike or picket but were laid off. The earlier

---

[14]The overruling of the motion to certify that case of course did not constitute an affirmance of that decision, but it indicates that the Supreme Court did not regard the question therein decided as of sufficient public or great general interest to allow the motion.

(1941) ruling of the court on a similar point in *Chrysler Corp. v. Smith* * * * [297 Mich., 438], holding that the basic test in determining an 'establishment' is 'functional integration,' is overruled.

"It is held unnecessary to determine whether any of the four subsections of the labor-dispute provision of the law applies to the employees (*e. g.,* whether they were 'directly interested' in the dispute), since, without a finding that there was a labor dispute in the 'establishment' where they were employed, the labor-dispute provision may not apply."

It is believed to be clear, from a consideration of the first headnote quoted above, that the decision in the Michigan case, *supra,* was influenced to a very great extent by the fact that the strike was at Canton in the state of Ohio, while the claimants were employed at the establishments of the employer located in the state of Michigan. In other words, the establishments were in two states, and that fact was pertinent. We have a like situation in the case being considered here, for the reason that the strike was at the "establishment" of the employer, maintained in the state of Michigan, while the individual claimants were employed at the "establishment" maintained by the employer in the state of Ohio.

It is the view of the writer that the definition of a "single employer" in the Ohio law is controlling in a decision on this appeal. Therefore, "single employer" will be considered later in this opinion.

For the purpose of indicating the similarity in the factual situation, the writer quotes from the opinion of the court in *Park v. Appeal Board, supra* (355 Mich., 103), as follows:

"EDWARD, J. These cases are of great financial importance to the litigants. Yet, after a careful review of over 1,600 printed pages of records and briefs, we conclude that they turn upon the answer to a relatively simple legal question—Does the term 'the establishment,' as used in the Michigan employment security act, encompass both Ford plants in the vicinity of Detroit, Michigan, and the Ford forge plant at Canton, Ohio, for the reason that the former cannot operate long without the latter?

"The question is by no means new. In very similar form, it has previously been submitted to the judicial systems of 9

states, each of which had at the time statutory language of like import to that of our state to construe.

"The appellate courts in Massachusetts, New Jersey, Minnesota, Kentucky, New York, Virginia, and Pennsylvania answered the question in the negative. Georgia's Supreme Court alone answered affirmately. In the 9th state, Texas, where compensation claims were allowed under a similar situation and somewhat similar statutory language, the present defendant stipulated to dismissal of its appeal—perhaps in anticipation of a legislative amendment favorable to its position, which did indeed follow.

"For reasons which we detail hereafter, we arrive at the same conclusion reached by the great majority of the courts which have considered the problem. Although, as we will note, much more is in dispute between these parties, in the end this decides the principal question in these cases.

"\* \* \*

"The union with which we are concerned in these cases is the International Union UAW-CIO which, during the period in question, was the exclusive collective bargaining agent of all of the hourly-production and maintenance employees of the Ford Motor Company in all of its plants throughout the United States. The contract between the UAW workers and the Ford Motor Company was for a 5-year period expiring June 1, 1955.

"\* \* \*

"Judges and lawyers can frequently do astonishing things with words. No layman would venture to suggest that the single word 'establishment,' used in the paragraph above could in normal usage be applied to both the Ford Rouge plant in Dearborn, Michigan, and the Ford forge plant in Canton, Ohio.

"The writer believes also that no layman, without a specific motive in mind, would read the statutory provisions quoted above and come to the conclusion that the Legislature had any such inclusiveness in its intended use of the word. Although the statute carries within it no definition of 'establishment,' its use of the term is, in our opinion, such as clearly to rule out the broad interpretation sought by appellees. Thus, the statute defines the term 'employing unit' in the same broad sense which appellees seek to apply to 'establishment':

" ' "Employing unit" means any individual or type of organization, including any partnership, association, trust, estate, joint-stock company, insurance company or corporation whether domestic or foreign * * *.' C.L.1948, Section 421.40 (Stat. Ann. 1950 Rev. Section 17.542).

"And, in the second sentence of the same definition paragraph, it makes such use of the word 'establishment' as, in our view, to preclude any attempt at definition in terms of all integrated plants of a company, wherever located:

" 'All individuals performing services within this state for any employing unit which maintains 2 or more separate establishments within this state shall be deemed to be employed by a single employing unit for all the purposes of this act.'

"Indeed, since appellee Ford Motor Company's basic premise is that all of its plants are integrated with its Michigan plants, it appears that appellee seeks an interpretation of the word 'establishment' synonymous with the term 'employing unit' as defined in the statute.

" * * *

"While the dictionary, the statute, and common sense all argue otherwise, we are urged that this court, in *Chrysler Corp.* v. *Smith*, 297 Mich., 438, 298 N. W., 87, 135 A. L. R., 900, so defined 'establishment' as to require our holding, as did the circuit judge and the appeal board, that the Ford Detroit area plants in Michigan and the Ford Canton forge plant in Ohio were all 1 'establishment.'

"It might be noted at the outset that no such factual situation was involved in *Chrysler Corp.* v. *Smith* as confronts us here. The plants there involved were all in 1 industrial community—the Detroit area; they were all located within 11 miles of one another; and they were all located in the state of Michigan. We deal here with a disqualification argument applicable to nonstriking employees in 3 Detroit area plants, all in Michigan, where the strike inducing the unemployment occurred in another community 150 miles away, and in another state.

" * * *

"We now turn our attention to precedents which deal directly with unemployment compensation cases where it has been argued that a strike in a plant in 1 state disqualifies those laid

off as a result in an integrated plant of the same company in another state.

"In 1949 a strike occurred in the Ford Rouge plant in Michigan. The effect of that strike was eventually to paralyze production in a considerable number of Ford assembly plants located in various states. The workers thus laid off sought unemployment compensation benefits under statutes quite similar (though in no case identical) to our own. In these cases, too, there were national issues pending on the bargaining table between the same union and the same company as are here involved, and the company arguments for disqualification of the employees-claimants were based on the contention that the Rouge plant strike in Michigan was really carrying forward the industrial argument for the benefit of Ford union members in New York, Georgia and California, to mention only the most widely scattered of the plants.

"The cases referred to arose from unemployment claims filed by workers at Ford plants (most of them assembly plants) at Hapeville, Georgia (see *Ford Motor Co.* v. *Abercrombie,* 207 Ga., 464, 62 S. E. [2d], 209); Louisville, Kentucky (see *Ford Motor Co.* v. *Kentucky Unemployment Compensation Commission* [Ky.], 243 S. W. [2d], 657); Somerville, Massachusetts (see *Ford Motor Co.* v. *Director of the Division of Employment Security,* 326 Mass., 757, 96 N. E. [2d], 859); St. Paul, Minnesota (see *Nordling* v. *Ford Motor Co.,* 231 Minn., 68, 42 N. W. [2d], 576, 28 A. L. R. [2d], 272); Metuchen and Edgewater, New Jersey (see *Ford Motor Co.* v. *New Jersey Department of Labor and Industry,* 5 N. J., 494, 76 A. [2d], 256); Buffalo and Green Island, New York (see *Machcinski* v. *Ford Motor Co.,* 277 App. Div., 634, 102 N. Y. S. [2d], 208); Chester, Pennsylvania (see *Ford Motor Co.* v. *Unemployment Compensation Board,* 168 Pa. Super., 446, 79 A. [2d], 121); Dallas, Texas (see *Ford Motor Co.* v. *Texas Employment Commission,* 7 C. C. H. Unemployment Insurance Rep., par. 8148, p. 46,744); and Norfolk, Virginia (see *Ford Motor Co.* v. *Unemployment Compensation Commission,* 191 Va., 812, 63 S. E. [2d], 28).

"As we have previously noted, compensation was allowed in 8 of these 9 cases after rejection of the argument that Ford Motor Company integration rendered the individual far-flung

plants 1 establishment with the Ford Rouge plant in Dearborn, Michigan. The exception was the Georgia case, where the Georgia Supreme Court rejected liberal construction of the unemployment compensation act and flatly stated with a finality unhampered by excess concern for fine definition or logic:

" 'We therefore hold that the Hapeville plant, at which the claimants were employed, and the Dearborn parts-producing plant, where the strike occurred and which compelled cessation of work at the Hapeville plant, were inseparable and indispensable parts of one and the same "factory, establishment, or other premises" as contemplated by those terms as employed in the act now being construed.' *Ford Motor Co.* v. *Abercrombie,* 207 Ga., 464, 470, 62 S. E. (2d), 209, 215."

In *Nordling* v. *Ford Motor Co.,* 231 Minn., 68, 42 N. W. (2d), 576, 28 A. L. R. (2d), 272, a statement is made, at page 88, concerning the use of the single word, "establishment," instead of the three terms, "factory, establishment, or other premises," and is pertinent here as the writer views the situation:

"Under Section 5(d) of the act proposed by the Social Security Board and under our original act, the unit of employment within which the labor dispute must exist in order to disqualify was designated as the *'factory, establishment, or other premises* at which he is or was last employed.' (Italics supplied.) Under our present act, Section 268.09, sub 1(6), the strike or labor dispute must be in progress 'at the *establishment* in which he is or was employed.' (Italics supplied.) It is doubtful that the change in terminology was intended to enlarge or diminish the unit of employment affecting the disqualification. It has been held that the words 'factory, establishment, or other premises' in the Alaska act, which is similar to the federal act, were *ejusdem generis* and that the principle of *noscitur a sociis* applies. *Aragon* v. *Unemployment Compensation Comm.* (9 Cir.), 149 F. (2d), 447, *supra.*

"We are inclined to believe that in our original act the word 'establishment' was intended to include those places of employment which could not be classified as a factory; that in the amendment the Legislature concluded that the term 'establishment' was inclusive of factory and all other types of em-

ployer units; and that there was no further need to use the word 'factory.' For a discussion of the distinction between factory and establishment, see *General Motors Corp.* v. *Mulquin,* 134 Conn., 118, 55 A. (2d), 732, *supra.''*

It seems clear that the so-called ''escape clauses'' in the unemployment compensation law of Michigan had no bearing in the conclusion which was reached by the Supreme Court of that state.

Headnote No. 2 quoted above indicates clearly, it is believed, that those clauses had no bearing on the conclusion or decision in the Michigan case, *supra.*

The opinion of the court discloses in greater detail that those disqualifying clauses in the Michigan law did not influence the decision.

Section 4141.01, Revised Code, defines ''employer'' as follows:

''(A) 'Employer' means any individual or type of organization including any partnership, association, trust, estate, joint-stock company, insurance company, or corporation, whether domestic or foreign, or the receiver, trustee in bankruptcy, trustee, or the successor thereof, or the legal representative of a deceased person who subsequent to December 31, 1936, had in employment three or more individuals at any one time within a calendar year.''

''Single employer'' is defined in Section 4141.01 as follows:

''All individuals performing services for an employer of any person in this state who maintains two or more establishments within this state are employed by a single employer for the purpose of *such sections.''* (Emphasis added.)

Section 4141.29 provides, with respect to ''eligibility for benefits'':

''Each eligible individual shall receive benefits as compensation for loss of remuneration due to total or involuntary partial unemployment in the amounts and subject to the conditions stipulated in Sections 4141.01 to 4141.46, inclusive, of the Revised Code.''

It is further provided, under subdivision (A), Section 4141.29, that ''no individual is entitled to a waiting period or benefits for any week unless he'' meets certain requirements as

specified in subsections numbered 1, 2, 3, 4 and 5, which subsections are not pertinent here.

Subsection (B) under Section 4141.29 is also not pertinent to the question under consideration.

Section 4141.29 provides, in part, that:

"(C) Notwithstanding division (A) of this section, no individual may serve a waiting period or be paid benefits for the duration of any period of unemployment with respect to which the administrator finds that such individual:

"* * *

"(2) Lost his employment or has left his employment by reason of a labor dispute other than a lockout at the factory, establishment, or other premises at which he was employed, as long as such labor dispute continues, and thereafter for a reasonable period of time necessary for such factory or establishment to resume normal operations."

It is clear that the Legislature intended that a "single employer" is an employer "who maintains two or more establishments within this state."

The Legislature did not intend that the definition of a "single employer" should include an employer who maintains two establishments located in different states. In order to be a "single employer," it is essential that the two establishments be maintained "within this state."

It will be noted that the definition of a "single employer" is applicable to "such sections," which necessarily includes Section 4141.29 affecting "eligibility for benefits" and also subsection (C) (2) which precludes benefits if the individual "lost his employment by reason of a labor dispute other than a lockout at the factory, establishment, or other premises at which he was employed * * *."

The definition of "single employer" is limited to an "employer" who maintains two or more "establishments within the state" and it does not include an employer who maintains one establishment in this state and another establishment in the state of Michigan.

It is clear also that the definition of a "single employer" is not confined or limited to the sections which have reference to payments which the employer is required to make into the fund,

but it is also applicable to "such sections" which govern "eligibility for benefits."

The employer who maintains one establishment in this "state" and another establishment in the state of Michigan is not a "single employer" with respect to the individuals employed in "this state" under "such sections."

Since the employer in this case maintains one establishment in the state of Michigan and another establishment in "this state," such employer is not a "single" or the same employer with respect to the individuals who lost their employment at the establishment in "this state" by reason of a labor dispute at the establishment located in the state of Michigan.

The reason, it would seem, for confining a "single employer" to an employer "who maintains two or more establishments within this state" is that the requirements of the unemployment compensation laws of the states vary and are different, both with respect to payments into the fund and also with respect to individual "eligibility for benefits."

The employer and employees at the Michigan establishment are subject to the requirements of the Michigan unemployment compensation laws, while the employer and employees in Ohio are subject to the requirements of the unemployment compensation laws of "this state."

In the Michigan law, the phrase, "employing unit," is used instead of the "single employer" used in the Ohio law, otherwise the definitions are almost identical. (See "employing unit" above.)

Since the individual claimants in this case did not lose their employment by reason of a labor dispute "at the factory, establishment, or other premises" at which they were employed, it is the conclusion of the writer that the claimants are entitled to unemployment compensation.